EXHIBIT 10

## Page 1

1 - 115

IN THE UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

MARLENE JOHANSEN,                )
    Plaintiff,                   )
    Counterclaim Defendant,      )
                                 ) Case No. 04-11789-RCL
V.                               )
                                 )
UNITED STATES OF AMERICA,        )
    Defendant,                   )
    Counterclaim Plaintiff,      )
                                 )
V.                               )
                                 )
NATIONAL CITY MORTGAGE CO.,      )
and TIMOTHY BURKE,               )
    Counterclaim Defendants.     )

THE ORAL DEPOSITION OF RALPH JOHANSEN, held pursuant to Notice, and the applicable provisions of the Federal Rules of Civil Procedure, before Marilyn Franklin, a Court Reporter and Notary Public, within and for the Commonwealth of Massachusetts, at the offices of Meilman and Costa, P.C., 70 Wells Avenue, Suite 200, Newton, Massachusetts, on Friday, May 27, 2005, commencing at 10:00 a.m.

## Page 2

PRESENT:
On Behalf of the United States of America:
    STEPHEN J. TURANCHIK, Trial Attorney, Tax Division
    United States Department of Justice
    P.O. Box 55/Ben Franklin Station
    Washington, D.C.  20044
    (202) 307-6565
On Behalf of the Witness:
    D. SEAN McMAHON, ESQ.
    Meilman & Costa
    70 Wells Avenue, Suite 200
    Newton, MA  02459

On Behalf of Marlene Johansen:

    TIMOTHY J. BURKE, ESQ.
    Timothy J. Burke & Associates
    400 Washington Street, Suite 303
    Braintree, MA  02184

## Page 3

INDEX

| WITNESS | | PAGE |
|---|---|---|
| Ralph Johansen | | |
| (by Mr. Turanchik) | | 6/111 |
| (by Mr. Burke | | 88 |

| EXHIBIT | DESCRIPTIO | PAGE |
|---|---|---|
| Ralph-1 | Documents in lieu of 1099 for | 21 |
| Ralph-2 | Three-page document, pension benefit | 40 |
| Ralph-3 | Letter from Allan B. Keith to Barry Connell | 44 |
| Ralph-4 | Letter from Phyllis Kolman to Barry Connelly dated 01/19/04 | 47 |
| Ralph-5 | Letter from Ed Mahlowitz to Marlene Johansen dated 06/08/01 with attachment | 48 |
| Ralph-6 | Judgment of divorce nis | 50 |
| Ralph-7 | Findings of fac | 51 |
| Ralph-8 | Modification judgemen | 57 |
| Ralph-9 | Opposition to motion for stay of divorce judgmen | 57 |
| Ralph-10 | Form 656 and Form 4337 | 1 |
| Ralph-11 | Form 4337 | 8 |
| Ralph-12 | Form 656 and Form 4338 | 0 |
| Ralph-13 | Amended Form 4338 | 1 |
| Ralph-14 | Documents, first page is cover letter from Alan Huberman to Kelly Dia | 82 |
| Ralph-15 | Order of the Commonwealth of Massachusetts Appeals Court, dated 06/07/0 | 95 |
| Ralph-16 | Complaint for contemp | 98 |
| Ralph-17 | Response to complaint for contempt | 100 |

## Page 4

Exhibits, Continued:

| EXHIBIT | DESCRIPTIO | PAGE |
|---|---|---|
| Ralph-18 | Motion for reconsideration | 100 |
| Ralph-19 | Letter to Ed Mahlowitz from Phyllis Kolman | 102 |

Page 57

[1] Q Let me have you turn back to Exhibit 6 for a minute,
[2] which is the judgment of divorce nisi.
[3] At some point in time, do you know if an appeal [4] was made of that judgment?
[5] A Yes.
[6] Q And do you know who appealed it?
[7] A Marlene.
[8] Q Do you know why she appealed it?
[9] A She wanted the house.
[10] Q Did you ever appeal the judgment?
[11] A No.
[12] (Johansen Deposition Exhibit [13] Ralph-8 marked.)
[14] Q BY MR. TURANCHIK: I show you what's marked as
[15] Government Exhibit 8 — sorry, Ralph Exhibit 8.
[16] And, actually, I'm going to hold off asking [17] questions on this. I should have marked them in [18] reverse order.
[19] MR. TURANCHIK: Let's mark that as 9.
[20] (Johansen Deposition Exhibit [21] Ralph-9 marked.)
[22] Q BY MR. TURANCHIK: I show you what's marked as Ralph-9 [23] and it is a copy of Appellee Ralph Johansen's
[24] opposition to appellant Marlene Johansen's motion for
[25] stay of divorce judgment.

Page 58

[1] First, have you ever seen this document before?
[2] A I may have. I don't know.
[3] Q All right. If you can turn with me to — it's actually [4] the second and third pages of this exhibit, but it's [5] labeled Pages 4 and 5. I don't seem to have Pages 2 [6] and 3.
[7] The Paragraph 3, which is on the bottom of [8] Page 4 —
[9] MR. McMAHON: Is marked as 4.
[10] MR. TURANCHIK: Thank you. But is marked as [11] Page 4.
[12] Q BY MR. TURANCHIK: --- has underlined as its title:
[13] Marlene's benefit from their failure to file tax [14] returns.
[15] And if you then turn to the third page of this [16] exhibit, there are a list of amounts that you have [17] provided to Marlene during the years '95 through 2000. [18] And I don't have a copy of the chalk that is referred [19] to here. Can you describe for me what took place in [20] the divorce trial regarding the chalk that was put on [21] the bulletin, on the board?
[22] A Phyllis asked me to go back and provide documents,
[23] checks of what. So we had to photocopy both front and
[24] back, and quite extensive, for each year, my payments [25] to Marlene for — I got paid twice a month, so each

Page 59

[1] month, the amount of the payments. Then anything else
[2] during this time frame that I was paying. Marlene [3] starting sending me the bills. Rather than confront [4] her, I just paid them.
[5] Q Now, when did that happen? Was that after your
[6] separation?
[7] A Yes.
[8] Q What type of expenses did you pay Marlene's expenses
[9] for following your separation?
[10] A There were a whole series of things that -- initially,
[11] before the trial, there was a court order, I was paying
[12] $515 a week.
[13] Q Mm-hm.
[14] A I paid household things that came up. We needed a new
[15] porch on the other side, so I ended up paying for that
[16] work to be done. I paid some of the oil bills. She [17] claimed that she didn't have enough money to heat the [18] house and that the pipes would break, so.
[19] I went through a whole series of things, but what [20] I did is I documented them and put them all on, you [21] know,
photocopies to everything, so that ---
[22] Q Now you were separated in 1997, and I'd like to just
[23] focus on the payment in '98, '99 and 2000.
[24] A Mm-hm.
[25] Q I see that there were $60,000 to Marlene from Ralph's

Page 60

[1] total income is listed here. The 60,000 -- does the [2] $60,000 include the 515 per week you -- or per month [3] you were paying?
[4] MR. McMAHON: Per week.
[5] Q BY MR. TURANCHIK: It was 515 per week, right?
[6] A Yes.
[7] Q Does the $60,000 include the 5 ---
[8] MR. McMAHON: No, you said.
[9] THE WITNESS: Oh, yeah.
[10] Q BY MR. TURANCHIK: Does the $60,000 include the 515 per [11] week?
[12] A I believe so.
[13] Q In '98, if you were paying 515 per week, that's $26,000
[14] or so. Did you pay another $33,000 on other expenses [15] to Marlene?
[16] A I'm ---
[17] Q I'm sorry?
[18] A I'm — sorry. When we were first separated ---
[19] Q Mm-hm.
[20] A --- I kept paying her the same amount. It wasn't till
[21] later, when the initial thing came out, I don't [22] remember which year it was that I was ordered to pay [23] the 515 — oh, here it is. In 1999.
[24] Q All right.
[25] A So in '98, I was still.

Page 61

[1] Q And so in '98, that $60,000 went to pay for the oil [2] bills and the, I guess, electricity and the mortgage [3] payments and the real estate taxes?
[4] A The reality was that it was going to pay credit cards.
[5] Marlene had opened accounts in Bloomingdale's, women's [6] clothing that I didn't even know what they were, all [7] sorts of different stores. And one of the things, she [8] opened up an account sometime in what's called QVC, [9] home shopping channel. It wasn't until that I was [10] separated, that I knew the extent of what was in my [11] name, and the credit card companies wouldn't let me [12] take my name off the accounts unless it was zero [13] balance.
[14] Q And were these amounts incurred after your separation?
[15] A There was a -- some were, some weren't. I mean, the [16] cards -- as near as I can piece together, Marlene, when [17] a monthly payment was due, would pay like just the [18] minimum.
[19] Q Mm-hm.
[20] A So it's like the interest just kept getting larger and [21] larger.
[22] Q The judgment of divorce nisi, the Court had ordered [23] that the house be sold to pay the tax liabilities. Did [24] you think that was a fair result?
[25] A Yes.

Page 62

[1] Q And why did you think that was a fair result?
[2] A Because I thought both of us were liable for -- I mean, [3] I assumed responsibility for it. Partly, I couldn't [4] deal with confronting Marlene any more.
[5] Q Well, you said both of you were liable. Is it that you [6] considered both of yourselves liable for the taxes or [7] that both of you benefitted from your earnings during [8] those years?
[9] A A combination of both, but we certainly -- I mean, we [10] lived a lifestyle that -- it was certainly not [11] extravagant, but it was -- you know, it was [12] comfortable, we had a house and we each had a car.
[13] MR. McMAHON: If I could just clarify?
[14] When you say you thought that both of us were [15] liable, you weren't speaking to a legal obligation, but [16] rather who was, in fact, responsible for creating [17] liability?
[18] THE WITNESS: Yes. Yes.
[19] MR. McMAHON: Thank you.
[20] Q BY MR. TURANCHIK: Now let me have you turn to [21] Exhibit 8. And I will represent to you this is a [22] modification judgment dated December 24th, 2001, and [23] also attached to this exhibit, Pages 3 and 4 of it, are [24] -- is an agreement entered into between yourself and [25] your wife, also dated December 24th, 2001.

Page 63

[1] First, have you seen these documents before?
[2] A Yes.
[3] Q And when did you first see these?
[4] A I first saw the handwritten portion when it was being [5] written on the 24th of December.
[6] Q Can you explain to me the circumstances surrounding the [7] drafting of the handwritten portion of this document?
[8] A When the first decision came down, Phyllis and Barry [9] Connelly, her lawyer, attempted to bring the real [10] estate agent to actually see the house. Marlene [11] totally freaked out, would not let them in the house. [12] I don't know, Phyllis was offended by the way it went [13] down.
[14] Q Mm-hm.
[15] A When Marlene decided -- she said that she was never [16] giving up the house.
[17] Q Mm-hm.
[18] A She then filed an appeal. At that time I had not been [19] allowed to get into the house. I never got any of my [20] possessions out of the house.
[21] Q Let me focus more on the --- .
[22] A Yeah.
[23] Q --- on the date. Following the appeal ---
[24] A Yes.
[25] Q --- were there negotiations to settle the matter

Page 64

[1] without going through the whole process of an appeal?
[2] A My lawyer advised me that to fight the appeal, she [3] would have to do a brief, that it would take an [4] extended amount of time, she didn't know how long, [5] based on how busy the courts were, and that it'd be [6] fairly expensive.
[7] Q My question was whether negotiations that took place [8] regarding resolving the matter, without having to go to [9] an appeal?
[10] Do you understand my question?
[11] A No.
[12] Q Okay.
[13] A Sorry.
[14] MR. McMAHON: Would you say that, if you don't [15] understand?
[16] Q BY MR. TURANCHIK: At some point in time this agreement [17] was reached. You have an agreement between two [18] different parties?
[19] A Yes.
[20] Q Now oftentimes when a agreement is being reached or [21] before an agreement is reached, the parties will [22] negotiate. They will say, I want this term or I want [23] that term. Was there a negotiation that took place [24] prior to this agreement being reached?
[25] MR. McMAHON: I'm going to object to the

Page 65

[1] characterization of it as an agreement. Proposed [2] judgment?
[3] MR. TURANCHIK: I wouldn't have a problem with [4] that, except the language on the document says [5] agreement of parties, and it says: It is hereby [6] agreed.
[7] MR. McMAHON: That it shall be made a judgment of [8] this Court.
[9] MR. TURANCHIK: Yeah, but ---
[10] MR. McMAHON: The document speaks for itself. I [11] just want to note the objection to the characterization [12] as an agreement due to the government's position in the [13] case.
[14] MR. TURANCHIK: Fair enough.
[15] Q BY MR. TURANCHIK: Mr.Johansen, prior ---
[16] A Yes.
[17] Q --- prior to this document being written and signed ---
[18] A Yes.
[19] Q --- were there negotiations between the parties?
[20] Or their lawyers?
[21] A The lawyers.
[22] Q And certainly even within ---
[23] MR. McMAHON: And the lawyers were discussing --
[24] just for clarity -- are the divorce lawyers.
[25] MR. TURANCHIK: Yes.

Page 66

[1] THE WITNESS: I'm sorry. The divorce lawyers were [2] trying to work something out and the bottom line was [3] Marlene wanted the house.
[4] Q BY MR. TURANCHIK: Do you know if the discussions [5] between the lawyers took place in one day, over a [6] course of weeks or do you know how, how the negotiation [7] worked?
[8] A I don't know the answer to that. I know there were [9] discussions.
[10] Q Mm-hm.
[11] A I don't know the length of time it took them to do [12] that. When we went to court, it was for contempt.
[13] Q Mm-hm.
[14] A I had signed off on -- I had filed for the IRA to be [15] split.
[16] Q Mm-hm.
[17] A I took that step. The pension plan hadn't been signed [18] off on yet. My lawyer told me that, basically, that if [19] you sign that off and she refuses to get out of the [20] house, you've got absolutely nothing.
[21] Q By the pension plan being signed off on, what do you [22] mean by that?
[23] A Whatever forms needed to be filled out to ---
[24] Q By that, do you mean that 50 percent of your pension [25] benefits would go to Marlene in the future?

Page 67

[1] A Yes.
[2] Q Okay. If you were to die -- I'm asking your [3] understanding.
[4] If you were to die prior to your pension being [5] payable to you, what would have happened -- let me back [6] up even further.
[7] If you were to die, God forbid, between now and [8] your pension paying out, what happens to those [9] payments?
[10] MR. McMAHON: As it is today?
[11] MR. TURANCHIK: As it is today.
[12] A As it is today, it goes to my current wife.
[13] Q BY MR. TURANCHIK: It would not go into your estate, it [14] would go to the named beneficiary?
[15] A Yes.
[16] Q All right. While you were married to Marlene, if you [17] died before your pension was payable, where would the [18] pension payments go?
[19] A It would have gone to her.
[20] Q To Marlene?
[21] A Yes. I'm sorry.
[22] Q Now as part of the judgment of divorce nisi, would half [23] of your pension payments have gone to your wife, [24] Marlene, regardless?
[25] MR. McMAHON: Regardless of?

Page 68

[1] MR. TURANCHIK: Oh, let me back up.
[2] Q BY MR. TURANCHIK: Actually, you know, the document [3] speaks for itself.
[4] MR. McMAHON: Paragraph 9?
[5] MR. TURANCHIK: Thank you.
[6] Q BY MR. TURANCHIK: Mr.Johansen, if you'd turn with me [7] to Exhibit No. 6, the judgment of divorce nisi?
[8] A Mm-hm.
[9] Q Paragraph 9 states, and I believe you are the defendant [10] in counterclaim, that: Ralph Johansen shall cause to [11] be prepared a qualified domestic relations order or [12] other appropriate document as required by the Canadian [13] Government to equally the coverture portion of the [14] Ralph Johansen's defined benefit pension plan as of the [15] date of trial. [16] Additionally, Ralph Johansen shall elect the joint [17] and survivor annuity option under said pension plan.
[18] Is the paperwork you're talking about, electing [19] the joint and survivor annuity option?
[20] A No, it's this whole thing, this qualified domestic [21] relations order.
[22] Q Do you know if a qualified domestic relations order was [23] ever entered in your divorce?
[24] MR. McMAHON: In regards to the pension?
[25] Q BY MR. TURANCHIK: With regards to the pen -- actually,

### Page 69

[1] with regard to the pension, first, do you know if a [2] qualified domestic relations ordered was entered in [3] your divorce with regard to your pension fund?
[4] A I don't believe so.
[5] Q Okay.
[6] A I don't know for a fact.
[7] Q Okay. Do you know if any qualified domestic relations [8] order were entered into at any time with regard to [9] anything in your divorce?
[10] A I don't know.
[11] Q Okay.
[12] A I'm sorry.
[13] Q I notice on Exhibit 8, the handwritten pages ---
[14] A Yeah.
[15] Q --- that the signatures appear to all take place on [16] December 24th, 2001?
[17] A Yes.
[18] Q Did those happen at the courthouse?
[19] A Yes.
[20] Q And I also happen to notice that the modification of [21] judgment, the first two pages of this document, are [22] dated December 24th, 2001?
[23] Look at the bottom.
[24] A Yes.
[25] Q Did the parties take this, the handwritten pages, into

### Page 70

[1] the Court and ask the Court to endorse that on the same [2] day? If you know?
[3] A I -- they brought it to the Judge. I don't know what [4] -- I presume that's -- I don't know what they ---
[5] Q Okay. That's fair enough.
[6] MR. McMAHON: Off the record for a second?
[7] MR. TURANCHIK: Odd the record.
[8] (Off the record at 11:16 a.m. to 11:32 a.m.)
[9] MR. TURANCHIK: We're back on the record.
[10] Q BY MR. TURANCHIK: And I had a question. You had [11] mentioned earlier that after you had moved out, there [12] were a number of possessions left in the house. And [13] it's my understanding that you have not seen those [14] possessions again.
[15] A No.
[16] Q What possessions have you not seen again that were left [17] in the house?
[18] A I have not seen any of my personal effects, my [19] pictures, any family personal things that have been [20] passed down, my fishing gear, I'm a fly fisherman. [21] Please don't laugh, but my beer can collection.
[22] Q Anything else?
[23] A And all my clothes.
[24] Q All right.
[25] MR. TURANCHIK: Let's mark this as 10.

### Page 71

[1] (Johansen Deposition Exhibit [2] Ralph-10 marked.)
[3] MR. TURANCHIK: Thank you.
[4] Q BY MR. TURANCHIK: Mr.Johansen, I show you what's [5] marked as Exhibit 10 and ask you to take a look at it.
[6] (Pause.)
[7] Q And I will represent to you that this is a Form 656, an [8] offer in compromise, as well as a Form 433A, which is a [9] collection information statement for individuals. And [10] these two items are routinely submitted to the IRS as [11] part of making an offer in compromise.
[12] If you would turn to the fourth page of this [13] exhibit. Is that your signature that appears on the [14] bottom of the page?
[15] A Yes.
[16] Q And it's dated October 16th, 2001. Do you remember [17] signing this on October 16th, 2001?
[18] A I remember signing it.
[19] Q Okay. Let me have you turn to the third-to-last page [20] of the exhibit. Is that your signature that appears on [21] this page?
[22] A Yes.
[23] Q What I'd like now to do is turn to the very first page. [24] On the left-hand side, there indications as to what tax [25] years you would like the IRS to consider at the offer

### Page 72

[1] in compromise. The years are '95 through 2001. In [2] October of 2001, was it your understanding that you had [3] or would have unpaid tax liabilities for each of those [4] years?
[5] A Yes.
[6] Q Now I notice this is dated October 16th of 2001, and [7] your final divorce -- the conclusion of the divorce was [8] December 24th, 2001.
[9] MR. McMAHON: Is this the modification agreement?
[10] MR. TURANCHIK: Yeah, the modification agreement.
[11] Q BY MR. TURANCHIK: Did you make this offer in [12] compromise while the divorce appeal was pending?
[13] MR. McMAHON: To the best of your knowledge.
[14] A I guess so.
[15] Q BY MR. TURANCHIK: Okay. Let me keep you on the third [16] page -- sorry, fourth page of this exhibit. There's a [17] typewritten statement which says: As a result of [18] hardships arising from an unstable marriage and the [19] ensuring divorce proceedings which currently continue, [20] I do not have sufficient assets to satisfy in full the [21] amount of my federal tax liability.
[22] In October of 2001, was that a true statement?
[23] A Yes.
[24] Q Let me have you turn to the Form 433A, which is a few [25] pages later; and, in particular, Section 4, which is

Page 73

[1] labeled: Asset & Liability Analysis.
[2] Do you remember reviewing this particular asset [3] and liability analysis before signing the document?
[4]   A I think so. I don't – I don't remember specifically [5] going through this.
[6]   Q Okay. Well, let me ask it this way: Does the cash in [7] the bank at $50 strike you as an accurate number for [8] what cash you had in the bank in October of 2001?
[9] Let me strike that.
[10] There are two lines under: Cash & Bank Accounts.
[11] Do those two numbers combine to about $17,332,
[12] comport with your recollection of how much money you
[13] had in the bank in October of 2001?
[14]   A I honestly don't know. I know I had been putting money
[15] in to try and make ---
[16]   Q Mm-hm.
[17]   A --- payments. So I ---
[18]   Q Mm-hm.
[19]   A --- you know, and I was dealing with the state at the
[20] same time. So I, you know, I put everything in to – I
[21] honestly don't know what.
[22]   Q Let me ask it differently. Do you think that you had
[23] more than $20,000 in the bank in October of 2001?
[24]   A No.
[25]   Q All right. Do you think you had less than that?

Page 74

[1]   A Yes.
[2]   Q All right. If I take a look at the next line, under [3] Line 24, the 2000 Dodge Caravan?
[4]   A Yes.
[5]   Q It looks like you are claiming the Caravan was worth
[6] about $16,000 and that you owed about $15,000 on it. [7] Does that comport with your recollection as to what the [8] Dodge Caravan was worth in October 2001?
[9]   A Best of my knowledge, yes.
[10]   Q The next area is a little confusing because it deals
[11] with the real property. And I see a current fair [12] market value there of 162,500, and I also see an [13] asterisk next to the equity in the asset being zero. [14] And I believe that refers to the next page. So if [15] you'd turn to the next page?
[16] I see here that you've taken a valuation of the [17] real property and it was for the real property at – [18] mm. Well, the property that you and your wife had [19] owned in Stoneham, what was the address on that [20] property?
[21]   A 71 Pleasant Street.
[22]   Q Is 73 Pleasant Street the other side of the duplex?
[23]   A Yes.
[24]   Q Okay. Do you know if the $325,000 that's listed here
[25] is for both 71 Pleasant Street and 73 Pleasant Street?

Page 75

[1]   A Yes.
[2]   Q So it's for both?
[3]   A Yes.
[4]   Q Good. I wanted to make sure that one wasn't valued at
[5] 325 and 73 was valued ---
[6]   A No, no, no.
[7]   Q --- at 325 and total they were worth 650.
[8]   MR. McMAHON: That'd be a lot of appreciation over [9] the value of the mortgage – the divorce statement.
[10]   MR. TURANCHIK: All right.
[11]   Q BY MR. TURANCHIK: So I see the valuation at 325. If
[12] you go down to the mortgage balance as of 8/8/01?
[13]   A Mm-hm.
[14]   Q Does that comport with your recollection of how much
[15] the mortgage balance was in October 2001?
[16]   A To the best of my knowledge, yes.
[17]   Q All right. And do you know what happened – let me
[18] actually go back to the very first page in this [19] exhibit, the offer in compromise. I see that the offer [20] there was 32,500.
[21]   A Yes.
[22]   Q Do you have any idea what the amount of your liability
[23] was at this time?
[24]   A Not off the top of my head.
[25]   Q Would you say it was over $200,000 at this time?

Page 76

[1]   A I don't think so. I think it was in the 170s, 180s.
[2]   Q Okay.
[3]   A Somewhere in there.
[4]   Q Actually, before I move on to the next – before I move
[5] on to the next exhibit, do you know what happened with
[6] this offer in compromise?
[7]   A It was – it was turned down.
[8]   Q Do you remember what the basis for that was?
[9]   A No. I ---
[10]   Q It's the best – as I said, there's no wrong answers in
[11] this deposition.
[12]   A All I can tell you is that I gave my accountant all the
[13] information. He was the one who was doing the offer in
[14] compromise and, you know, he asked me for specific
[15] information and I provided, as honestly as I could,
[16] everything that he asked for. How he got to those [17] figures, I don't know.
[18]   Q Before this offer was submitted, did you provide your
[19] accountant with the notices the IRS gave you regarding
[20] your outstanding tax liabilities?
[21]   A Yes.
[22]   Q Okay.
[23]   MR. McMAHON: I think it's safe to say that he was
[24] hoping that the offer would be accepted and instead of
[25] accepting the offer, the permit sent us you.

## Page 77

[1] Q BY MR. TURANCHIK: Did your accountant mention anything [2] to you regarding tax liens that arise upon having [3] unpaid tax liabilities?
[4] MR. BURKE: Objection.
[5] MR. McMAHON: Do you understand the question?
[6] THE WITNESS: No.
[7] MR. TURANCHIK: Okay.
[8] Q BY MR. TURANCHIK: When you met with your – did you [9] meet with your accountant before this offer in [10] compromise was prepared?
[11] A Yes.
[12] Q I figured. I will ask many questions that are very [13] easy.
[14] (Laughter.)
[15] Q After that meeting, did your accountant ever talk to [16] you about tax liens?
[17] A Yes.
[18] Q Has your accountant ever mentioned anything along the [19] lines of secret tax liens?
[20] MR. McMAHON: I'm going to object, based on [21] conversations he had with the accountant as being [22] privileged, but you can go ahead and answer.
[23] A No. Not to the best of my knowledge. That's the first [24] time I've ever heard the term.
[25] Q BY MR. TURANCHIK: Okay.

## Page 78

[1] (Johansen Deposition Exhibit [2] Ralph-11 marked.)
[3] Q BY MR. TURANCHIK: I show you what's marked as [4] Exhibit 11 and ask you to take a look at it.
[5] (Pause.)
[6] Q And Exhibit 11 is a Form 433A. Would you turn to the [7] second-to-last page of this exhibit?
[8] Do you recognize that signature on this exhibit?
[9] A I believe it's Steve's.
[10] Q And by Steve, who do you mean?
[11] A I'm – Steve Friedman.
[12] Q All right. And he's your accountant?
[13] A Yes.
[14] Q Was he your accountant before the offer in compromise [15] that we have marked as Exhibit 10?
[16] A Yes.
[17] Q I notice that on Exhibit 11 it's dated August 5th, [18] 2002.
[19] MR. McMAHON: You're talking to the signature on [20] the second-to-last page?
[21] MR. TURANCHIK: The signature to the [22] second-to-last page.
[23] Q BY MR. TURANCHIK: Do you know why this one was [24] completed in August of 2002?
[25] A Are you asking me the time line?

## Page 79

[1] Q Along those lines. I mean, there was an offer made in [2] March – sorry, October of '01, and less than a year [3] later I see another Form 433. Do you know if another [4] in compromise was made in August of 2002?
[5] MR. McMAHON: To the best of your knowledge.
[6] A To the best of my knowledge, whatever the first offer [7] was ---
[8] Q BY MR. TURANCHIK: Mm-hm.
[9] A --- it was advised that it wasn't acceptable ---
[10] Q Mm-hm.
[11] A --- and that we had to up our offer, so I presume this [12] is the second. I don't know.
[13] Q Okay. That's – that's all I'm asking.
[14] A Yeah. I don't know.
[15] Q Do you have any idea how many offers in compromise [16] you've made to the IRS regarding these outstanding [17] taxes?
[18] A No.
[19] Q Do you think it's more than two?
[20] A I don't know. All I know is that when something was [21] submitted, they'd never get back to us, and then they'd [22] ask for more documents, and I don't know whether that [23] constitutes a read.
[24] Q Mm-hm.
[25] A I don't know.

## Page 80

[1] Q Fair enough.
[2] MR. TURANCHIK: I've got duplicates here and I'd [3] prefer not to mark them all.
[4] (Johansen Deposition Exhibit [5] Ralph-12 marked.)
[6] Q BY MR. TURANCHIK: I'll show you what's marked as [7] Exhibit 12 and ask you to take a look at it. And I [8] will represent to you that this Exhibit 12 is comprised [9] of two forms, again, a Form 656, an offer in [10] compromise; followed by a Form 433A, a collection [11] information statement for wage earners and [12] self-employed individuals.
[13] Would you please turn to the fourth page of this [14] exhibit? And let me know, is that your signature that [15] appears on that page?
[16] A Yes.
[17] Q And on the page, it also states: As a result of [18] hardships arising from a recent divorce, I do not have [19] sufficient assets to satisfy in full the amount of my [20] federal tax liability.
[21] In March of 2003, was that a true statement?
[22] A Yes.
[23] Q And would you turn to the very last page of this [24] exhibit?
[25] Is that your signature that appears on the bottom

Page 81

[1] of the page?
[2]  A Yes.
[3]  Q If you can turn to the very first page of this offer in
[4] compromise, I see on the right-hand side it states: I [5] offer to pay $45,000.
[6] I just note that for now.
[7]  MR. TURANCHIK: Let mark this as 13.
[8]  (Johansen Deposition Exhibit [9] Ralph-13 marked.)
[10]  Q BY MR. TURANCHIK: I show you what's marked as
[11] Exhibit 13 and ask you to take a look at it. And if [12] you would turn to the very last page of the exhibit, [13] Page 4?
[14] Is that your signature that appears on the bottom [15] of the page?
[16]  A Yes.
[17]  Q See that says March 7th, 2003, and if you turn back to
[18] Exhibit 12, that's also dated March 7th, 2003?
[19]  A Yes.
[20]  MR. McMAHON: Sorry, it's actually that page.
[21]  THE WITNESS: Yes.
[22]  Q BY MR. TURANCHIK: Do you remember in March of '03
[23] making two different offers? And the reason I say that [24] is, because if you turn to the first page of [25] Exhibit 13, the offer amount is 48,750 as opposed to

Page 82

[1] $45,000?
[2]  A Mm-hm.
[3]  Q Do you remember making two offers in March of '03?
[4]  MR. McMAHON: To the best of your knowledge.
[5]  A To the best of my knowledge, yes. From what I
[6] remember, there was – Steve was in consultation with
[7] whoever the IRS officer was and was told that I'd have [8] to up it.
[9]  Q BY MR. TURANCHIK: Okay. Okay.
[10]  A That's to the best of my recollection.
[11]  MR. TURANCHIK: Let's mark this as 14
[12]  (Johansen Deposition Exhibit [13] Ralph-14 marked.)
[14]  Q BY MR. TURANCHIK: Mr. Johansen, I show you what's been [15] marked as Exhibit 14 and ask – you can take a look at [16] it.
[17]  (Pause.)
[18]  Q It is comprised of a cover letter from Alan Huberman,
[19] CPA, to Ms. Kelly Diaz at the IRS.
[20] First, have you seen this exhibit, these [21] documents, before?
[22]  A I honestly don't know.
[23]  Q Okay.
[24]  (Pause.)
[25]  Q I'd like you to turn to the third page of this exhibit,

Page 83

[1] which is Page 2, under the title: Memorandum, re: [2] Ralph Johansen.
[3] In particular, I'd like to focus on the third full [4] paragraph. It states: In order to comply with the [5] terms of this agreement – the agreement dated [6] December 24th, 2001 – Ralph executed a quit claim [7] deed, transferring his interest in the former marital [8] home to Marlene. As is preferred for title [9] recordation, the deed made out to Marlene reflected the [10] deed in Ralph – in Marlene and Ralph, i.e., the new [11] deed transferred the property from Marlene and Ralph to [12] Marlene.
[13] First, do you remember signing such a deed, where [14] it was in both your names to Marlene following the [15] December 24th, 2001, modification?
[16]  A Yes.
[17]  Q Do you know what happened after you signed that, to the
[18] best of your recollection?
[19]  A To the best of my recollection, I signed, and it was
[20] notarized and Phyllis sent it to Ed Markowitz.
[21]  Q Mahlowitz?
[22]  A Mahlowitz. I'm sorry. Whoever was Marlene's attorney
[23] at that time.
[24]  Q Do you know what happened to that deed next?
[25]  MR. BURKE: Objection.

Page 84

[1]  Q BY MR. TURANCHIK: If you know?
[2]  A I don't know.
[3]  Q Okay. At some point in time did you have to execute a
[4] second deed?
[5]  A Yes.
[6]  Q And when did that happen?
[7]  A Later in – I don't know the exact date, but it was – [8] it was much later.
[9]  Q Do you think it was – do you think it was as late as
[10] December of 2003?
[11]  A Yes. November, December, someplace in around there.
[12]  Q Okay. And do you know what happened to that deed?
[13]  A No.
[14]  Q Mr. Johansen, let me take you back to Exhibit 10, which
[15] is the offer in compromise from October 2001.
[16] When this offer in compromise was submitted, you [17] didn't think that you could fully pay your back tax [18] liabilities from your assets, right?
[19]  A No.
[20]  Q Did you think that you could fully pay your tax
[21] liabilities from your future earnings?
[22]  A I'm sorry?
[23]  Q Did you think you could fully pay your back tax
[24] liability from your future earnings?
[25]  A No.

Page 85

[1] Q If you were to combine your assets and your future
[2] earnings together, do you think those two in [3] combination
could fully pay your back taxes?
[4] A No.
[5] Q If you were to combine your assets, your future
[6] earnings and your future pension income stream [7] together,
do you think those combined could have paid [8] your back taxes?
[9] MR. BURKE: Objection. You can answer.
[10] A I don't think so.
[11] Q BY MR. TURANCHIK: Why not?
[12] A Because the interest and penalties just keep going.
[13] I'd have to do a monthly payment plan and with the way
[14] the interest and penalties were going, it was just
[15] accruing.
[16] Q And so even with everything put together in October of
[17] 2001, you didn't think there was any way you could pay
[18] your back taxes?
[19] A No.
[20] Q Okay. Focusing on that – keeping on Exhibit 10. If
[21] you turn to the very – I'm sorry, the second – [22] third-to-last
page, it shows on the left-hand side your [23] income, and on the
right-hand side your expenses, and [24] shows about leftover
income of about $500 or so?
[25] MR. McMAHON: After subtracting the expenses

Page 86

[1] listed, you mean?
[2] MR. TURANCHIK: Yes, after subtracting the [3] expenses
listed.
[4] A Yes.
[5] Q BY MR. TURANCHIK: And you seem to recall at that time
[6] your liability was somewhere in the range of 175-,
[7] 185-thousand dollars?
[8] A I believe so.
[9] Q And if you were to use all of your disposal income, did
[10] you figure it would take you about more than 20 years [11] to
pay off this back tax liability, assuming there were [12] no interest
and penalties?
[13] A Yes.
[14] MR. McMAHON: Nice assumption.
[15] Q BY MR. TURANCHIK: Mr.Johansen, I don't have any
[16] further questions for you at this time. Your attorney [17] may
have some questions for your or Mr.Burke may have [18] some
questions for you.
[19] MR. McMAHON: I have no questions for my client at
[20] this time; however, similar to the stipulations that we [21] put
on the record at the deposition of Marlene, I would [22] just like to
indicate that we are currently still [23] waiting for a decision from
the U.S. District Court as [24] to whether or not Mr.Johansen will
be allowed to [25] intervene in this case; therefore, the deposition
that

Page 87

[1] has been conducted thus far today is pursuant to a [2] witness
subpoena as part of discovery served by the [3] United States in
this case.
[4] For purposes of economy and practicality, we are [5] going to
allow Marlene Johansen's attorney to ask [6] whatever questions
he would like of the witness with [7] the understanding that an
objection is noted on the [8] record that if there is any question
about any [9] testimony that is elicited today as part of this
[10] deposition, that the parties are reserving their right [11] to
seek to strike that testimony whereas Mr.Johansen [12] is not
currently a party to the case.
[13] MR. BURKE: Is that – in light of the fact that [14] since he,
Mr.Johansen, is under subpoena today, and [15] under the
general rules of conducting a deposition, I [16] am allowed to ask
him questions, extensive questions, [17] actually, in his testimony
here, irrespective to the [18] fact whether he's allowed to intervene
or not.
[19] And, Mr.Turanchik, can we have your view on that?
[20] MR. TURANCHIK: Yeah, I would agree with [21] Mr.Burke's
recitation of that. When a third-party [22] witness is subpoenaed,
the parties to the lawsuit are [23] permitted to ask questions of that
third-party witness.
[24] So while you can have the objection for the [25] record---

Page 88

[1] MR. McMAHON: The objection is noted.
[2] MR. TURANCHIK: Right.
[3] MR. McMAHON: We do not need to go into [4] dissertation
of the law of subpoenaing witnesses.
[5] MR. TURANCHIK: Right.
[6] MR. McMAHON: Mr.Burke is going to be allowed to [7] ask
questions.
[8] MR. TURANCHIK: Right.
[9] MR. McMAHON: With objections duly noted.
[10] EXAMINATION BY MR. BURKE:
[11] Q Good afternoon, sir.
[12] My name is Tim Burke and I have been retained by [13] your
ex-wife, Marlene, to represent her in the United [14] States District
Court relative to actions that request [15] that the government
release any claims that it alleges [16] it has to your former marital
residence.
[17] What I'd like to do today is to give you an idea [18] – we've
never spoken before – the idea what we're [19] going to do here, is
you've testified today. There's a [20] couple of things I think we
should clarify for the [21] record. And I have a series of questions,
also, that [22] relate to a few things that happened in the divorce.
[23] Earlier today I believe you testified, and correct [24] me if I'm
wrong, that in response to one of [25] Mr.Turanchik's questions,
you indicated that your wife

Page 89

[1] had established some credit card debts, one of those [2] debts being something called QVC; is that true?
[3]   A Yes.
[4]   Q And during your divorce proceeding before the Court, [5] did you request from the Court that you receive credit [6] for those credit card debts which you alleged you paid?
[7]   A I'm sorry?
[8]   Q Let me rephrase it.
[9] At some point, sir, you had a trial for your [10] divorce ---
[11]   A Yes.
[12]   Q --- is that true?
[13] And do you have any recollection of your wife's -- [14] excuse me, of your attorney requesting that the Court [15] consider that your wife had incurred credit card debts [16] that you had paid?
[17]   A I ---
[18]   MR. McMAHON: Do you understand the question?
[19]   THE WITNESS: No.
[20]   Q BY MR. BURKE: Let me try -- I'll try another way.
[21] You -- during the divorce, did you maintain that [22] your wife had incurred some credit card debts, which [23] you paid?
[24]   A Yes.
[25]   Q And did you bring that before the Court in your

Page 90

[1] position?
[2]   A Yes. I believe so. I ---
[3]   Q And in the Court's ruling, did the Court accept your [4] position?
[5]   MR. McMAHON: Objection to the term, accept.
[6]   MR. BURKE: Could we go off the record here for a [7] second?
[8]   (Off the record at 12:02 p.m. to 12:07 p.m.)
[9]   Q BY MR. BURKE: Sir, do you have any recollection, and I [10] can call your attention to Exhibit No. 7, Page No. 7.
[11] And on Page No. 7, about a third of the way down [12] there's ---
[13]   A I'm sorry.
[14]   Q On Page No. 7 or marked No. 7, toward the bottom of the [15] page there is a bolded comment: Conclusions of law. [16] If you go one paragraph above that, the paragraph [17] starts with: Given.
[18] The paragraph above that says: Although the [19] husbands seeks additional credits for the consumer debt [20] of the wife, which he has paid down, the Court is not [21] inclined to grant this credit.
[22] Do you have any recollection of the Court ruling [23] that, sir?
[24]   A To be honest, no.
[25]   Q Did you ever appeal that ruling?

Page 91

[1]   A No.
[2]   Q Thank you. Sir, how long did you pay the mortgage on [3] your former marital residence after you left the home? [4] For how long did you pay it?
[5]   A I never paid it.
[6]   Q Well, did you -- how did -- how did the mortgage get [7] paid?
[8]   A Deducted it from the joint account.
[9]   Q And how did the funds get into the joint account?
[10]   A I gave Marlene money for the household bills.
[11]   Q And did you continue to do that after you moved out of [12] the home in 1997?
[13]   A Yes.
[14]   Q Why did you do that
[15]   A Didn't want to leave her destitute.
[16]   Q At any point in time did the Court order you to [17] continue those payments?
[18]   A I don't know that I was asked to continue those [19] payments. They came down with a figure of $515 a week. [20] I don't remember when that actually took place.
[21]   Q But did you feel it was in your best interest to [22] continue with the payments on the mortgage?
[23]   A Marlene was not working. I did not want to leave her [24] destitute. I ---
[25]   Q Was it in your best interest to keep the house, too?

Page 92

[1]   MR. McMAHON: Objection. You can answer.
[2]   A I didn't think of it that way.
[3]   Q BY MR. BURKE: Okay. A few minutes ago, sir, [4] Mr.Turanchik asked you some questions on a series of [5] financial statements that you filed. There is an [6] Exhibit No. 10, there is an Exhibit No. 11, and there [7] is an Exhibit No. 12. If you could review those [8] statements and if you could locate for me any notation [9] on those statements of the value of the pension that [10] you have with the Canadian Government, if you could [11] find that for us and point it out to us, I'd be [12] appreciative.
[13]   A Exhibit 10, 11 and what?
[14]   Q 10, 11 and 12.
[15]   A And 12?
[16]   A I don't have 12, I don't think.
[17]   (Pause.)
[18]   THE WITNESS: Do you have 12?
[19]   MR. McMAHON: Yeah, I have them here.
[20] Do you want to go off of my copies?
[21] Are you referring to -- Exhibits 10, 11 and 12 are [22] each multiple page documents. Can you be more specific [23] as to what you're directing his attention to?
[24]   MR. BURKE: I could. I don't want to entirely [25] direct his testimony.

Page 93

[1] MR. McMAHON: I'm not going to have him sit here [2] and review. I mean, we're looking at, what, 15 pages [3] of documents that have been culled together by his [4] accountant over – I mean, I don't know what period, [5] but there's a lot of information in these documents. I [6] don't expect that Mr. Johansen has memorized these and [7] I'm concerned about boxing him into an answer without [8] adequate time to review all of the information [9] contained in these documents. So ---
[10] MR. BURKE: Well, in two regards. I personally [11] having reviewed these see no reflection anywhere of a [12] Canadian Government pension. I don't intend to box [13] your client in, so I'm more than willing to spend as [14] much time as he requires to review these documents. [15] And if my review of these documents is in error and [16] there is a notation here for the Canadian pension, I [17] would like to be informed of that today.
[18] MR. McMAHON: Well, I think the documents speak [19] for themselves; and if you were unable to see anything [20] reflected in there, then that very well may be the [21] case, but he is here to answer questions, and I don't [22] want to get into a match about this. But, I mean, if [23] you have a specific question about something on the [24] document, I would ask that you direct his attention to [25] it and ask him the appropriate question.

Page 94

[1] I don't think it's appropriate that he be given a [2] stack of documents and say, you know, give me your [3] characterization of these documents. He hired a [4] professional accountant to assist him with the offer in [5] compromise, specifically, because he did not have the [6] tax expertise that was necessary and is necessary to [7] file an offer in compromise. And I assumed that he [8] expected that the accountant who is retained and [9] performed that service did it adequately and according [10] to the rules of the IRS.
[11] MR. BURKE: The question still stands, unless you [12] instruct your client not to answer the question.
[13] MR. McMAHON: There is no question. What is the [14] question?
[15] MR. BURKE: I am going to ask your – I will reask [16] your client.
[17] Q BY MR. BURKE: Sir, I'll ask you to review Exhibits 10, [18] 11 and 12, and if you could tell us if there's any [19] notation on any of the pages included in those exhibits [20] as to the value of the Canadian pension or any [21] indication whatsoever of the existence of the Canadian [22] pension?
[23] MR. McMAHON: Do you understand his question?
[24] THE WITNESS: He's asking if ---
[25] A My understanding is you're asking if there's a line

Page 95

[1] item on here that says ---
[2] Q BY MR. BURKE: Canadian pension and a value next to it.
[3] A Yeah.
[4] (Pause.)
[5] MR. McMAHON: Again, to the best of your [6] knowledge.
[7] A To the best of my knowledge, no.
[8] MR. BURKE: I'd like to have this marked as an [9] exhibit. Mine aren't quite that long. Thank you, sir.
[10] Just keep the same order?
[11] MR. McMAHON: Yes.
[12] MR. BURKE: 14.
[13] MR. McMAHON: I think 15, actually.
[14] (Johansen Deposition Exhibit [15] Ralph-15 marked.)
[16] Q BY MR. BURKE: Sir, earlier today Exhibit No. 6 was [17] introduced, and that was the judgment of the Probate [18] Court, and that was entered on the face of the document [19] on March 21, 2001. Have you ever seen the document [20] which we have just marked as Exhibit No. 15, which is [21] the Order of the Commonwealth of Massachusetts Appeals [22] Court, dated June 7th, 2001?
[23] A Not that I know of. And to the best of my [24] recollection, no.
[25] Q At any point in time did you ever develop the knowledge

Page 96

[1] that your former wife, Marlene, had filed an appeal of [2] your divorce judgment?
[3] A Yes.
[4] Q And at any point in time did you develop some knowledge [5] that the Court had placed a stay on certain terms of [6] that divorce judgment?
[7] A I'm sure that my lawyer would have advised me.
[8] Q On the divorce judgment, which is Exhibit 6, and in [9] Paragraph No. 9 in Exhibit 6, it orders you to cause to [10] be prepared a qualified domestics relations order. Did [11] you ever do that?
[12] A To the best of my knowledge, no.
[13] Q And do you know why you didn't do that?
[14] A I don't know.
[15] THE WITNESS: Ah ---
[16] MR. McMAHON: Do you need to ask me a question?
[17] (Off the record at 12:15 p.m. to 12:19 p.m.)
[18] Q BY MR. BURKE: Mr. Johansen, at some point during the [19] year 2000, did you have knowledge that, as part of your [20] divorce, that your Canadian pension was to be in some [21] way allocated between you and your wife?
[22] A In 2000?
[23] Q 2001.
[24] A Oh, 2001. Yes, when the divorce nisi, whatever you [25] call it, came down.

Page 97

[1] Q And did you also have knowledge that Marlene, your [2] ex-wife, Marlene, had appealed the Probate Court's [3] order to the Massachusetts Appeals Court and asked that [4] the house, the marital home, not be sold as requested [5] in the court order?
[6] A Yes, I knew during that year that she appealed it.
[7] Q And at some point during the year 2001, did you have [8] knowledge that the Court had issued an order placing a [9] stay on the sale of the marital residence?
[10] A Is that the appeal?
[11] Q Yes.
[12] A Did I know there was an appeal? Yes, I knew there was [13] an appeal, if that's your question.
[14] MR. McMAHON: I think what he's asking you is that [15] as part of the appeal, are you aware that there was [16] ever a court order, for example, what has been marked [17] as Exhibit 15, that stayed the sale of the house which [18] would have paid the taxes? Even if you haven't seen [19] it, just read Exhibit 15.
[20] A I'm sure my lawyer, Phyllis Kolman, advised me that [21] there was, you know, an appeal. As to the specific [22] paragraphs, I honestly don't know.
[23] Q BY MR. BURKE: At some point, sir, during the year [24] 2001, did you become aware of a complaint for contempt [25] that had been filed against you?

Page 98

[1] A Yes.
[2] MR. BURKE: Off the record for just one second.
[3] (Off the record at 12:20 p.m. to 12:21 p.m.)
[4] (Johansen Deposition Exhibit [5] Ralph-16 marked.)
[6] Q BY MR. BURKE: Sir, we just placed in front of you [7] Exhibit No. 16. Have you ever seen this document [8] before?
[9] A To the best of my knowledge I probably did, but I don't [10] know for a fact that I saw the exact — I don't [11] remember the wording on this front, but I do remember [12] the summons and everything.
[13] Q So you do remember that there was a summons issued that [14] required you to be in court on November 26th, 2001?
[15] A Mm-hm. I don't remember the exact date.
[16] Q And do you know why your ex-wife was bringing you [17] before the Court on a complaint for contempt?
[18] A Do I know?
[19] Q Yes.
[20] A Partly for harassment. Of the three things that are [21] listed here, two of them had already been done and she [22] knew about it, and yet they were still listed. And the [23] one thing that hadn't been finalized at that time was [24] this QDRO. But she knew about the other things.
[25] Q When the complaint for contempt was outstanding, to

Page 99

[1] your knowledge at that time, whether any other issues [2] that were also outstanding?
[3] MR. McMAHON: Do you understand the question?
[4] THE WITNESS: No.
[5] Q BY MR. BURKE: The complaint for contempt, is it fair [6] to say, that related to the issue of the QDRO? Is that [7] true?
[8] A Yes.
[9] Q And was there any ongoing issues with the marital home [10] at that time?
[11] MR. McMAHON: In October 2001?
[12] Q BY MR. BURKE: Approximately October 2001?
[13] A I don't know. When you're saying issues?
[14] Q Was the issue of the sale of the marital home on [15] appeal?
[16] A My understanding of things, to the best of my [17] recollection, is that the whole divorce findings were [18] being appealed by Marlene. If you — I'm not quite — [19] what you're asking me to stipulate to here.
[20] Q I'm not asking you to stipulate to anything. I'm just [21] trying to ask for your recollections.
[22] Did you have any understanding, if the entire [23] divorce was on appeal, why you could be brought before [24] the Probate Court on a complaint for contempt?
[25] MR. McMAHON: To the best of your knowledge.

Page 100

[1] A I don't.
[2] MR. BURKE: Mark this as the next one. The [3] complaint was 16, this will be 17.
[4] (Johansen Deposition Exhibit [5] Ralph-17 marked.)
[6] Q BY MR. BURKE: I've just handed you Exhibit No. 17, [7] which you've taken a chance to review. Have you ever [8] seen this document before?
[9] A I honestly don't know. I believe I — Phyllis was very [10] good at giving copies of things. To say that I [11] specifically remember this individual document, I can't [12] say.
[13] Q Phyllis Kolman, Phyllis being Phyllis Kolman, your [14] attorney?
[15] A Yes.
[16] Q And do you believe what is in this memorandum is [17] truthful?
[18] A I've just scanned it, but it looks, looks right. I [19] have no idea on these — whatever these things on the [20] arguments are. Legalese, I don't.
[21] (Johansen Deposition Exhibit [22] Ralph-18 marked.)
[23] Q BY MR. BURKE: And I'll call your attention, sir, we [24] may get back to Exhibit No. 17, but I will call your [25] attention to Exhibit No. 18, and if you could take a

Page 101

[1] look at that, I'd appreciate.
[2] (Pause.)
[3] Q Have you ever seen this document before, Exhibit
[4] No.18, sir?
[5] A I most likely did, but I can't say I saw this [6] individual document.
[7] Q In July of the year 2001, did you have any
[8] understanding that your lawyer was requesting that the
[9] Appeals Court not stay the sale of your former marital
[10] home?
[11] A Would you repeat the question, please?
[12] Q I'll try it another way. In July of 2001 ---
[13] A Yeah.
[14] Q --- did you know or did you understand that your
[15] attorney had asked the Appeals Court to reconsider its
[16] order wherein it ruled that the stay – there was going [17] to be a stay on the sale of your home, your former [18] marital home in Stoneham?
[19] A I know she was appealing it. Yes.
[20] Q And did you understand that the home could not be sold?
[21] A During the time of the appeal?
[22] Q Yes.
[23] A I don't know that I was conscious of it, but I would – [24] I placed everything in the hands of my lawyer and [25] whatever she was doing in terms of negotiating.

Page 102

[1] Q Sir, at some point did you wind up going to court in
[2] December of 2001?
[3] A Yes.
[4] Q And do you have a knowledge as to why you were there?
[5] A For the contempt issue.
[6] Q Prior to going to court, had your lawyer made a
[7] proposal to Marlene's lawyer to resolve your issues?
[8] A My understanding was that she had dialogue with Ed back
[9] and forth as to what Marlene actually was looking for [10] and the house was the central issue. My understanding. [11] I don't know.
[12] MR. BURKE: Exhibit 19.
[13] (Johansen Deposition Exhibit [14] Ralph-19 marked.)
[15] Q BY MR. BURKE: I've just place – Steve has actually
[16] placed in front of you Exhibit No. 19.
[17] (Pause.)
[18] A Okay.
[19] Q Have you ever seen Exhibit 19 before, sir?
[20] A Yes. I believe so.
[21] Q Did you see it in December of 2001?
[22] A I honestly couldn't tell you when I saw it. I presume [23] so.
[24] Q In December of 2001, was your attorney authorized to [25] make this offer?

Page 103

[1] A Was she authorized to make this?
[2] Q Did she have your permission to write a letter, such as
[3] Exhibit No. 19?
[4] A I had full faith in my lawyer to do the best she could [5] for me.
[6] Q In December of 2000 (sic), sir, is it fair to say – [7] strike that.
[8] During the trial of your divorce, did your wife [9] have an expert testify as to the value of your Canadian [10] pension?
[11] A Yes.
[12] Q And what value did he place on that pension?
[13] A I honestly don't know.
[14] Q Does the number, say approximately, $250,000, does that [15] sound about right?
[16] A I honestly don't know. If that's what it says in the
[17] documents, but I honestly don't remember that.
[18] Q In December of 2001, sir, is it fair to say that you [19] had an IRA which was worth approximately $10,000?
[20] A When?
[21] Q In December of 2001.
[22] A I don't believe so. I had – the IRA, which was worth
[23] $12,000, was split up so that Marlene got half of it, [24] and I believe it was like 12,000 and change. So.
[25] Q But it was split. And how much did you hold?

Page 104

[1] A I took half of it and she took half of it. They [2] transferred.
[3] Q It was less than 10,000?
[4] A Yes.
[5] Q In the year 2001, did you think you could retire on
[6] $10,000?
[7] A No.
[8] Q In December of 2001, other than the Canadian pension,
[9] did you have anything else to retire on?
[10] A I had no other IRAs or anything, if that's what you're
[11] asking. I don't know what ---
[12] Q Just try to answer the question, sir, and if ---
[13] A I'm sorry, I'm not trying to be evasive. I don't quite
[14] understand. I guess, no.
[15] Q Did you have any investment accounts anywhere?
[16] A No.
[17] Q In the year 2001, at some point did you expect to
[18] retire?
[19] A No.
[20] Q Not during the year 2001, but at some point in the
[21] future?
[22] A Some point in the future, yes. I hope so.
[23] Q In the year 2001, did you have a belief that you would
[24] need a pension to live on once you retired?
[25] A Did I believe I needed to have money to exist? Yes.

Page 105

[1] Yes.
[2] Q Sir, not all these questions are tricky.
[3] A I apologize. Yes.
[4] Q So lawyers have a bad reputation, sometimes they're
[5] relatively simple.
[6] A That's what threw me. I'm sorry.
[7] MR. McMAHON: Don't worry, if you say something
[8] wrong, I'll jump up.
[9] Q BY MR. BURKE: Is it fair to say, sir, in the year —
[10] excuse me, in December of 2001, that the Canadian
[11] pension had a value?
[12] A Yes.
[13] Q Was that value small to you?
[14] A No.
[15] Q Is it fair to say that pension had a substantial value
[16] to you?
[17] A Yes. That's what I was going to live on.
[18] Q Sir, in December of 2001, did you have a knowledge or a
[19] perception that the two assets in dispute were your
[20] home in Stoneham and your Canadian pension?
[21] A Yes.
[22] Q And in the Court's order, wherein it found facts, it
[23] had placed the value on your home of $325,000 before
[24] liabilities. Is that true?
[25] A I believe that's the figure.

Page 106

[1] Q And you may want to refresh your recollection.
[2] A Which document?
[3] Q I believe it's on Page 3 of Ralph Exhibit No. 7.
[4] A No. 7?
[5] Q Yes.
[6] (Pause.)
[7] A Yes.
[8] Q And there were some debts on that property, were there
[9] not, sir?
[10] A Yes.
[11] Q And if you move to Page 7 of the Court's order, the
[12] paragraph from the prior page continues, and the last
[13] sentence of Exhibit No. 7, Page 7, the Court states:
[14] The only real asset the parties have, other than the
[15] husband's defined benefit pension plan, is the marital
[16] home, which has equity of approximately $172,387.
[17] Do you see that, sir?
[18] A Yes.
[19] Q Do you believe the Court was wrong in saying that, sir?
[20] A No.
[21] Q That's a fair statement?
[22] A Yeah. I think so.
[23] Q And if no one objects, if — is it fair to say, sir, if
[24] you look at the 172,000 and you divide that by 2, half
[25] of 172 is 86,000?

Page 107

[1] A Yeah.
[2] (Laughter.)
[3] Q So is it a fair statement, sir, that you believed — [4] you think it's a fair statement that, you know, half
[5] the equity in the home was worth about 86,000?
[6] A Mm-hm.
[7] Q When you went to court in December of 2001, did you
[8] understand there were two things on the table, one
[9] being the pension, the other being the marital home?
[10] A There was another issue on the table, as well.
[11] Q And what was that?
[12] A In terms of negotiation, she wanted more money.
[13] Q Okay. And how did that negotiation for more money work
[14] out?
[15] A She got an extra $50 a week.
[16] Q But in terms of your assets, there was the home and
[17] there was the pension; am I correct?
[18] A Yes.
[19] Q And earlier in December, and I don't want to
[20] characterize another attorney's work, did not your
[21] attorney offer to trade the interest Marlene may have
[22] in the pension for the equity in the home?
[23] MR. TURANCHIK: Objection to form.
[24] THE WITNESS: I'm sorry, I don't know what that
[25] means.

Page 108

[1] MR. TURANCHIK: I'm just objecting to the [2] question, but you can still answer it.
[3] MR. McMAHON: Do you understand the question?
[4] (Laughter.)
[5] THE WITNESS: I don't even know what he said.
[6] MR. TURANCHIK: I said, objection to form.
[7] MR. McMAHON: To form?
[8] MR. TURANCHIK: Right.
[9] MR. BURKE: Rarely can I say this, but ignore the
[10] government.
[11] (Laughter.)
[12] MR. TURANCHIK: I'm not instructing you not to
[13] answer.
[14] MR. BURKE: One of the few advantages of doing a
[15] deposition with Mr. Turanchik, he speaks almost as fast
[16] as I do.
[17] (Laughter.)
[18] THE WITNESS: Would you repeat the question?
[19] MR. BURKE: I'm going to rephrase the question.
[20] Q BY MR. BURKE: Did you understand in December of
[21] 2000 (sic) that your attorney offered to Marlene's attorney
[22] to transfer your interest in the marital home and in
[23] exchange Marlene would give up her interest in your
[24] Canadian pension?
[25] A Yes.

### Page 109

[1] Q You did understand that?
[2] A And when you went to court on December 24th of 2001,
[3] did you ultimately enter into an understanding that was
[4] accepted by the Court that you would trade your [5] interest in
the home for Marlene's interest in the [6] Canadian pension?
[7] A Yes.
[8] Q Do you think that was a fair deal?
[9] A Yes.
[10] MR. BURKE: If I may have two more seconds?
[11] MR. TURANCHIK: Yes.
[12] MR. BURKE: Go off the record.
[13] (Off the record at 12:46 p.m. to 12:47 p.m.)
[14] Q BY MR. BURKE: Since December of 2001, sir, have you
[15] remarried?
[16] A Yes.
[17] Q Is Marlene Johansen holding any interest in your formal
[18] marital home on your behalf?
[19] A Not that I know of.
[20] Q Is she acting as your straw, sir?
[21] A No.
[22] Q Is she acting as your nominee?
[23] A No.
[24] Q At any point in time did you and your former wife enter
[25] into any negotiations wherein she would hold your

### Page 110

[1] interest in the former marital home for you?
[2] A Absolutely not.
[3] Q Any point in time did you and your former wife enter
[4] into negotiations whereas the exchange or the trade [5] which
happened on December 17th, 2000 — excuse me, [6] strike that —
December 24, 2001, was done as a way of [7] beating the federal
taxes?
[8] A No.
[9] Q Sir, in December of 2001, when you exchanged the home,
[10] your interest in the home for the pension interest, do [11] you
consider it a deal for adequate and fair [12] consideration?
[13] A Yes.
[14] Q There was no ulterior motive, sir?
[15] A No.
[16] Q If you didn't make the exchange, sir, isn't it true [17] that
the case could have taken a lot longer?
[18] A Yes.
[19] Q If you didn't make the exchange, sir, isn't it true you
[20] could have come out with a worse result?
[21] A Yes.
[22] MR. McMAHON: It would have been a violation of [23] the
Probate Court order.
[24] MR. BURKE: I have no further questions.
[25] MR. TURANCHIK: Mr. Johansen, I have just a few

### Page 111

[1] follow-up questions. [2] EXAMINATION BY MR. TURANCHIK:
[3] Q Did Marlene have an interest in your pension fund
[4] because she was your wife?
[5] A Yes.
[6] MR. McMAHON: Objection.
[7] MR. TURANCHIK: Well, no, allow me to rephrase [8] that.
[9] Q BY MR. TURANCHIK: Was it your understanding that
[10] during your marriage Marlene had an interest in your
[11] pension fund because she was your wife?
[12] A She was my beneficiary.
[13] Q Did you ever negotiate with her for her to become your
[14] beneficiary?
[15] A No.
[16] Q Did you ever have a discussion with her that I'm
[17] thinking about making my brother a beneficiary instead [18] of
you?
[19] MR. McMAHON: Objection. You're asking questions
[20] regarding private conversations between a married
[21] couple during the marriage, which is disqualified under
[22] Massachusetts law.
[23] MR. TURANCHIK: Except those marital privileges [24] don't
apply in tax cases.
[25] MR. McMAHON: I would read the Mass. statute,

### Page 112

[1] actually.
[2] MR. TURANCHIK: I think I can rephrase the [3] question to
keep it from being objectionable.
[4] Q BY MR. TURANCHIK: Did Marlene obtain an interest in
[5] your pension fund because of a contract that you had
[6] entered into with her?
[7] MR. McMAHON: Object.
[8] MR. BURKE: I'll object, but you can answer.
[9] A I was married to her. That's a contract.
[10] Q BY MR. TURANCHIK: But aside from the marriage
[11] contract, there was no separate contract, was there?
[12] A No.
[13] MR. TURANCHIK: I don't have any further [14] questions.
[15] Thank you.
[16] We are concluded with Mr. Johansen's deposition at
[17] 12:52 p.m.
[18] (Whereupon, the deposition was concluded at [19]   (12:52p)